*Neal Lawrence, IV v. State of Maryland*, No. 32, September Term, 2020. Opinion by Getty, J.

**CRIMINAL LAW – PROHIBITION ON WEARING, CARRYING, OR TRANSPORTING A HANDGUN – MENS REA**

Relying on the doctrine of *stare decisis*, the Court of Appeals held that Md. Code (2002, 2021 Repl. Vol.), Crim. Law ("CR") § 4-203(a)(1)(i) sets forth a strict liability offense. Thirty-three years ago, in *Lee v. State*, this Court determined that the predecessor statute to CR § 4-203(a)(1)(i) imposed strict liability for wearing, carrying, or transporting a handgun on or about the person. 311 Md. 642 (1988). Where the language of CR § 4-203(a)(1)(i) is substantially unchanged from its predecessor, the Court of Appeals held that the statute's plain language, statutory structure, and legislative history all support the *Lee* Court's holding. In light of the Supreme Court's longstanding presumption that criminal statutes include *mens rea* as an element, the Court declined to overlook the General Assembly's clear intent by reading a "knowingly" *mens rea* into the statute. Moreover, the Court determined that, in the thirty-three years since *Lee* has been decided, the General Assembly has acquiesced to the Court's holding in that case. Thus, in checking its statutory interpretation of CR § 4-203(a)(1)(i) against the Due Process Clause of the United States Constitution and Maryland case law involving "public welfare offenses," the Court declined to depart from *stare decisis*.

Circuit Court for Harford County
Case No. 12-K-17-001269
Argued: February 4, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 32

September Term, 2020

_____

NEAL LAWRENCE, IV

v.

STATE OF MARYLAND

_____

Barbera, C.J.
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Getty, J.

_____

Filed: August 10, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case involves the statutory interpretation of § 4-203 of the Criminal Law Article, which sets forth Maryland's prohibition on "wear[ing], carry[ing], or transport[ing] a handgun, whether concealed or open, on or about the person[.]"[1] We are tasked with determining whether the General Assembly intended for its enactment, which does not include language indicating *mens rea*, to set forth a strict liability offense. Thirty-three years ago, in *Lee v. State*, 311 Md. 642 (1988), this Court unanimously and unequivocally held that the predecessor statute to CR § 4-203(a)(1)(i) imposed strict liability for wearing, carrying, or transporting a handgun on or about the person.[2] Although short, the *Lee* Court's analysis determined that the plain language and legislative history of Article 27, § 36B(b) both pointed to one conclusion—that the General Assembly intended to create a strict liability offense by wholly omitting *mens rea* as an element of the offense.

As part of Maryland's code revision, the General Assembly enacted the Criminal Law Article in 2002. Article 27, § 36B(b) was recodified as CR § 4-203(a) but the language remained substantially unchanged from the wording analyzed by the *Lee* Court. The General Assembly subsequently amended the statute eight times without altering the language of CR § 4-203(a)(1)(i). Relying on the doctrine of *stare decisis*, which ordinarily requires this Court to adhere to its precedent, we hold that the General Assembly intended for CR § 4-203(a)(1)(i) to set forth a strict liability offense. While we recognize the Supreme Court's longstanding presumption that criminal offenses contain *mens rea* as an

---

[1] Md. Code (2002, 2021 Repl. Vol.), Crim. Law ("CR") § 4-203(a)(1)(i).

[2] Of course, this prohibition was subject to the exceptions in Article 27, § 36B(c). *See Lee*, 311 Md. at 658 n.7; Md. Code (1957, 1982 Repl. Vol.), Article 27, § 36B(b), (c).

element, the text, structure, and legislative history of CR § 4-203(a)(1)(i) preclude us from reading a "knowingly" *mens rea* into the statute.

Moreover, in declining to amend the statutory language in the thirty-three years since *Lee* was decided, the General Assembly has acquiesced to this Court's holding in that case. Where CR § 4-203(a)(1)(i) is neither unconstitutional under the Due Process Clause of the Fourteenth Amendment, nor in conflict with Maryland law outlining strict liability "public welfare offenses," we are unconvinced that an exception to the doctrine of *stare decisis* applies here. Thus, because *Lee* is still good law, we affirm the judgment of the Court of Special Appeals and interpret CR § 4-203(a)(1)(i) as setting forth a strict liability offense.

## BACKGROUND

### A. *The Arrest.*

In the early morning hours of July 29, 2017, Maryland State Police Trooper Nicolas Urbano ("Trooper Urbano") responded to the report of a red Nissan Altima stopped in the middle of Route 152 near Interstate 95 in Harford County. Upon arriving at the stopped vehicle, Trooper Urbano observed that the engine was running, the brake lights were activated, and the driver's side window was open. Trooper Urbano approached the vehicle and noticed that an unresponsive male was sitting in the driver's seat. Trooper Urbano first tried to speak to the unresponsive male through the open driver's side window, but he did not respond. Trooper Urbano then yelled for the male to wake up, however, he remained unresponsive. This prompted Trooper Urbano to shake the individual's shoulder and

2

administer a sternum rub.[3]  The male did not respond.  Trooper Urbano then opened the driver's side door, put the car in park, and administered a second sternum rub.

At trial, Trooper Urbano identified the male in the driver's seat of the Nissan as Neal Lawrence, IV and testified that Mr. Lawrence regained consciousness after the second sternum rub.  As Mr. Lawrence regained consciousness, Trooper Urbano "observed what appeared to be the handle or back of a handle of a handgun."  Trooper Urbano explained that the handgun was located "kind of in between [Mr. Lawrence's] legs in the center of the driver's seat but on the floorboard."  Trooper Urbano ordered Mr. Lawrence out of the car and, after assisting him from the driver's seat, placed him in handcuffs.

Trooper Urbano patted down Mr. Lawrence's clothing for weapons and, according to his testimony, he immediately noticed the odor of alcohol.  At this time, Mr. Lawrence told Trooper Urbano that he was travelling from his house in Baltimore to his girlfriend's house in Edgewood.  Having removed Mr. Lawrence from the vehicle and placed him in handcuffs, Trooper Urbano then "went back to the vehicle and secured the handgun that was under the driver's seat on the floorboard."  Trooper Urbano testified that, after removing the handgun from the vehicle, he removed the magazine from the handgun and observed that it contained four bullets.

---

[3] Trooper Urbano testified that a "sternum rub" is a technique that involves using your knuckles to "rub the sternum or bone area between the breast."  It is used to cause "discomfort" that "usually wakes" an unconscious subject.  *See also Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1127 n.5 (E.D. Cal. 2016) ("A sternum rub is a technique used to wake people from unconsciousness by applying pressure with the knuckles to the sternum." (internal quotation marks and citation omitted)).

While conducting his investigation, Trooper Urbano also attempted to determine whether Mr. Lawrence owned the Nissan. Trooper Urbano testified that, during his investigation, he conducted a search in the National Crime Information Center ("NCIC") database that allowed him to access records from the Maryland Motor Vehicle Administration ("MVA").[4] Based on MVA records found in the NCIC database, Trooper Urbano determined that Mr. Lawrence owned the vehicle.[5] At the conclusion of Trooper Urbano's investigation, he placed Mr. Lawrence under arrest and drove him to the State Police Barracks in Bel Air.

After arriving at the State Police Barracks, Trooper Urbano conducted a full search of Mr. Lawrence's person and found "crack cocaine rocks inside one of [Mr. Lawrence's] socks." Mr. Lawrence consented to a battery of field sobriety tests, from which Trooper Urbano determined that Mr. Lawrence was under the influence of alcohol or a controlled dangerous substance. Trooper Urbano's conclusion was confirmed later that morning when, while Mr. Lawrence was in custody, police officers administered an Intoximeter test that registered a blood alcohol concentration of .13.[6]

---

[4] The NCIC database is a computer system "through which licenses, vehicle registrations, and outstanding warrants are checked[.]" *Byndloss v. State*, 391 Md. 462, 469 (2006).

[5] However, on cross-examination, defense counsel presented Trooper Urbano with a "temporary registration card" from the time of the arrest and a "permanent registration card" that both named Isis England as the registered owner of the vehicle.

[6] "An Intoximeter is the instrument officers use to determine the alcohol concentration of suspected drunk drivers." *Portillo Funes v. State*, 469 Md. 438, 456 n.4 (2020) (citing *Motor Vehicle Admin. v. Smith*, 458 Md. 677, 683 n.5 (2018)). The legal limit for the blood alcohol concentration of a motorist in Maryland is .08. *Id.* at 456.

Mr. Lawrence waived his *Miranda*[7] rights and admitted that he had smoked "crack" a few hours before he was found unresponsive by Trooper Urbano. When asked about the handgun found in the vehicle, Mr. Lawrence stated that it was not his and "denied knowing anything about" it. Based on Trooper Urbano's investigation and Mr. Lawrence's admissions, the State charged Mr. Lawrence with possession of ammunition by a disqualified person; possession of a regulated firearm by a disqualified person; wearing, carrying, or transporting a handgun on or about the person; possession of cocaine; driving under the influence of alcohol; and driving while impaired by a controlled and dangerous substance.

**B.      The Trial and Appeal.**

       *1.      The Jury Instruction.*

Mr. Lawrence stood trial in the Circuit Court for Harford County and, at the close of evidence, his counsel objected to the State's requested jury instruction on the wearing, carrying, or transporting a handgun charge. The jury instruction sought by the State read:

> The defendant is charged with the crime of carrying [or] transporting a handgun upon their person. In order to convict the defendant, the State must prove: (1) That the defendant, wore, carried, or transported a handgun that was within his reach and available for his immediate use.
> A handgun is a pistol, revolver, or other firearm, capable of being concealed on or about the person, and which is designed to fire a bullet by the explosion of gunpowder.[8]

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[8] The pattern jury instruction for wearing, carrying, or transporting a handgun on or about the person, Maryland Criminal Pattern Jury Instruction 4:35.2, provides:

> The defendant is charged with the crime of carrying a handgun. In order to convict the defendant, the State must prove: that the defendant wore,

Mr. Lawrence's counsel objected to the instruction and argued that it incorrectly disposed

of the *mens rea*—knowledge—required to convict under this charge:

> There doesn't seem to be any requirement for the person to even know they have the firearm on their person. When I say on the person, it doesn't have to be on the person. It can be apparently transported somewhere in a vehicle and under the definition still be technically on your person. So, I guess you could have a gun in your car or someone could secret a small gun in your jacket and you could be convicted without any knowledge at all merely because the gun, in fact, was there without any scienter or mens rea on your part of criminal intent.
>
> The gun in this case is a regulated firearm. . . . To have that firearm it has to be knowingly possessed. There is a definition for possessed, which the possession is similar to that in the other instruction of being within your reach or grasp. So, you have a regulated firearm, you have to have knowledge, but if that same regulated firearm is in your car arguably you don't have to have knowledge, which makes no sense.
>
> Additionally, there are bullets in the firearm and under the definition of ammunition it again indicates that you have to have knowledge and possess it. So, you can have a firearm in your car that you don't know about, you can't be convicted on the bullets in the firearm because there you have to have knowledge . . . but seemingly you could be convicted on a [firearm] which is . . . in your car that you don't know about under the definition, which makes no sense. So, that is my objection. I just don't think the instruction could possibly be correct.

The trial court disagreed and overruled the objection:

> THE COURT: I understand. . . . [I]f we were talking about a situation where we were trying to craft an instruction that did not or was not addressed in the pattern, I think we would have to spend a little bit more time on this. But

---

carried, or transported a handgun that was within his or her reach and available for his or her immediate use.

A handgun is a pistol, revolver, or other firearm, capable of being concealed on or about the person, and which is designed to fire a bullet by the explosion of gunpowder.

Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instruction* 4:35.2 (2d ed., 2020 Supp.) (cleaned up). The pattern instruction is the same today as it was during Mr. Lawrence's trial.

when we have a pattern instruction, I am generally not going to deviate from that pattern absent there being some compelling argument particularly citing case law which would support such a position. I believe you indicated when we were back in chambers that you were not aware of any case law on point that would address the issue.

[DEFENSE COUNSEL]: No.

THE COURT: So, since we are dealing with a pattern jury instruction, I'm not going to edit[] that in any way, shape or form. Whether that is an issue that should be addressed by the legislature, I'll leave that to somebody else to decide, but it seems to me it is creating a distinction between a general intent and a specific intent crime.

[DEFENSE COUNSEL]: But in both instances you have an intent. I'm saying you can't have an intent when you have no knowledge. But I understand the Court's position.

2. *The Verdict and Motion for a New Trial.*

The trial court propounded the State's requested pattern jury instruction for wearing, carrying, or transporting a handgun on or about the person. The jury returned a split verdict and acquitted Mr. Lawrence of possession of ammunition and possession of a regulated firearm by a disqualified person. The jury convicted Mr. Lawrence of wearing, carrying, or transporting a handgun on or about the person; possession of cocaine; driving under the influence of alcohol; and driving while impaired by a controlled dangerous substance.

Mr. Lawrence timely moved for a new trial and argued that the trial court improperly ignored the *mens rea* element of wearing, carrying, or transporting a handgun by propounding the State's requested jury instruction. In a hearing on Mr. Lawrence's motion for a new trial, the trial court denied the motion from the bench and explained why it did not add "knowledge" as a required element of the crime:

7

All right. The Court did have some pause because of the very recent decision in *Williams versus State*[9] from the Court of Appeals that deals with the issue of where a pattern instruction was wrong. Of course, it is often hammered home to judges that you can't go wrong with using the pattern instructions. But, of course, as *Williams* indicates that is not always true because sometimes the pattern instructions are wrong.

But the difference between *Williams* and this case is that in *Williams*, as I read it, the pattern instruction did not properly set forth the elements that are established in the statute and in the present case the statute very clearly sets forth two separate elements of the two types of offenses or actually there are five total options under Section 4-203.

The two that are applicable here are wear, carry or transport a handgun whether concealed or open on or about the person. The State's position, and the Court agrees, that that [sic] is the crime, the nature of the crime that the Defendant was charged with and which was instructed to the jury in which the jury found the Defendant guilty of.

The second option there is wear, carry or knowingly transport a handgun whether concealed or open in a vehicle, and that clearly contains the knowingly element in that count, but given that the indictment in this case is for wear, carry or transport a handgun, whether concealed or open, on or about the person, the Court concludes that the instruction that I gave which does not include the element of scienter is the proper instruction to give in this case.

The trial court sentenced Mr. Lawrence to a five-year term of imprisonment with all but two years suspended. Of that sentence, three years were attributable to the wearing, carrying, or transporting a handgun conviction. Mr. Lawrence received credit for 355 days of time served and was sentenced to an additional eight-year term of imprisonment for violating the conditions of his probation.

3.    *The Appeal.*

Mr. Lawrence appealed his conviction on the handgun charge to the Court of Special Appeals and challenged whether "the lower court err[ed] in failing to instruct the jury, as

---

[9] *Williams v. State*, 462 Md. 335 (2019).

8

requested, that Mr. Lawrence could not be convicted of carrying or transporting a handgun about his person absent knowledge of the presence of that weapon[.]" *Lawrence v. State*, No. 319, Sept. Term, 2019, 2020 WL 4015838, at *1 (Md. Ct. Spec. App. July 16, 2020). In an unreported opinion filed on July 16, 2020, the Court of Special Appeals affirmed the trial court and held that "knowledge" is not an element of wearing, carrying, or transporting a handgun on or about the person. *Id.* at *7.

Mr. Lawrence filed a petition for writ of certiorari, which this Court granted on October 6, 2020, to answer the following question:

> Is wearing, carrying, or transporting a handgun on or about one's person a strict liability crime?

*Lawrence v. State*, 471 Md. 101 (2020).

For the reasons below, we answer that question in the affirmative and hold that the trial court did not err in propounding the State's requested jury instruction. Although this Court and the Supreme Court disfavor omitting *mens rea* as an element of criminal statutes, the doctrine of *stare decisis* compels us to interpret the statutory elements of Md. Code (2002, 2021 Repl. Vol.), Crim. Law ("CR") § 4-203(a)(1)(i) as omitting *mens rea*. Based on the plain text of the statute, our previous holding in *Lee*, and the General Assembly's acquiescence to that decision, we hold that "knowledge" is not an element of the crime charged. We therefore affirm the judgment of the Court of Special Appeals.

## DISCUSSION

### A. *Standard of Review.*

9

We review a trial court's decision to propound or not propound a proposed jury instruction under an abuse of discretion standard. *Stabb v. State*, 423 Md. 454, 465 (2011) (citing *Gunning v. State*, 347 Md. 332, 351(1997)). The discretion given to trial judges

> is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Id.* (quoting *In re Don Mc.*, 344 Md. 194, 201 (1996)). We accordingly "consider the following factors when deciding whether a trial court abused its discretion in deciding whether to grant or deny a request for a particular jury instruction: (1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Id.* (citing *Gunning*, 347 Md. at 348).

Matters of statutory interpretation are questions of law; therefore, we interpret the meaning of CR § 4-203(a)(1)(i) *de novo*. *Wash. Gas Light Co. v. Maryland Pub. Serv. Comm'n*, 460 Md. 667, 680 (2018). As the Court of Special Appeals aptly stated below, our ultimate goal "is to determine whether the jury instruction correctly identified the elements of the statutory crime." *Lawrence*, 2020 WL 4015838, at \*6.

**B.** ***Did the General Assembly Intend for CR § 4-203(a)(1)(i) to be a Strict Liability Crime?***

Whether the trial judge below abused his discretion in propounding the State's requested jury instruction, which omitted "knowledge" as an element of wearing, carrying,

10

or transporting a handgun on or about the person, turns on the statutory interpretation of CR § 4-203(a)(1)(i). *See Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)) ("Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent."). Specifically, we are tasked with determining whether the General Assembly intended to include scienter, or *mens rea*, as an element of wearing, carrying, or transporting a handgun on or about the person. This Court's process of statutory interpretation is well-defined, and "[our] primary goal is to ascertain the purpose and intention of the General Assembly when they enacted the statutory provisions." *United Bank v. Buckingham*, 472 Md. 407, 423 (2021) (quoting *Town of Forest Heights v. Maryland-Nat'l Capital Park and Planning Comm'n*, 463 Md. 469, 478 (2019)).

CR § 4-203 prohibits five acts related to wearing, carrying, or transporting a handgun and provides:

> (a)(1) Except as provided in subsection (b) of this section, a person may not:
>> **(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;**
>> (ii) wear, carry, or **knowingly** transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;
>> (iii) violate item (i) or (ii) of this paragraph while on public school property in the State;
>> (iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person; or
>> (v) violate item (i) or (ii) of this paragraph with a handgun loaded with ammunition.
> (2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.

11

CR § 4-203(a) (emphasis added).[10]   The statute also contains nine exceptions to the prohibited acts listed above.  *See* CR § 4-203(b).

 1.     *The Parties' Contentions.*

Mr. Lawrence asks this Court to read into the statute a requirement that the State prove "knowledge" as an element of CR § 4-203(a)(1)(i).[11]   In arguing that the General Assembly has *always* intended for "knowledge" to be an element of subparagraph (a)(1)(i), Mr. Lawrence raises several points.  He first relies on the text and posits that the General Assembly's use of transitive verbs, *i.e.* "wear," "carry," and "transport," suggests that the legislative intent of subparagraph (a)(1)(i) was to punish only affirmative acts that are carried out knowingly.  Mr. Lawrence then asserts that the statute's legislative history and the Supreme Court's general distaste for eliminating *mens rea* as an element of criminal statutes bolster his preferred interpretation.  Lastly, Mr. Lawrence makes several arguments as to why this Court should depart from its reasoning in *Lee v. State*, which held that the predecessor statute to CR § 4-203(a)(1)(i) was a strict liability offense.  311 Md. 642 (1988).  Mr. Lawrence contends that *Lee* is inconsistent with both Maryland and Supreme

---

[10] At the time Mr. Lawrence was charged with violating CR § 4-203, subsection (a)(1) only contained four subparagraphs.  In 2018, the General Assembly amended CR § 4-203(a)(1) to include a fifth prohibition, subparagraph (v).  CR § 4-203(a)(1)(v) prohibits violating "item (i) or (ii) of this paragraph with a handgun loaded with ammunition" and is not at issue in this case.

[11] For ease of reading, we sometimes refer to the subsections and subparagraphs of CR § 4-203 directly as such, *i.e.*, "subparagraph (a)(1)(i)."   To be clear, all references to subsections or subparagraphs relate to CR § 4-203.

12

Court case law, and that interpreting CR § 4-203(a)(1)(i) as a strict liability offense brings its constitutionality into question.

On the other hand, the State argues that the text of CR § 4-203(a)(1)(i) unambiguously disposes of a *mens rea* requirement and creates a strict liability offense for wearing, carrying, or transporting a handgun on or about the person. The State maintains that the General Assembly's decision to include "knowingly" as an element of CR § 4-203(a)(1)(ii) fortifies its conclusion that the General Assembly's intent in enacting the predecessor statute to CR § 4-203(a)(1)(i)—which aimed to stem widespread gun violence in the 1970s—was to create a strict liability offense. In response to Mr. Lawrence's argument that *Lee* was wrongly decided and is incompatible with subsequent case law, the State asks this Court to adhere to the doctrine of *stare decisis*. The State sets forth that *Lee* does not fall under an exception that would urge the Court to abandon its previous holding and that attaching strict liability to CR § 4-203(a)(1)(i) is compatible with both this Court's and the Supreme Court's understanding of strict liability in the criminal context.

2.    *Lee v. State.*

This is not the first time that we have considered whether the General Assembly intended to attach strict liability to wearing, carrying, or transporting a handgun on or about the person. In *Lee v. State*, this Court was presented with almost the exact issue that we face here: "Does the Maryland statute prohibiting the carrying of a handgun require knowledge of the presence of the handgun[?]" 311 Md. at 646.

13

At that time, the predecessor statute to CR § 4-203—Md. Code (1957, 1982 Repl. Vol.), Article 27, § 36B(b)—contained similar language[12] to the current statute:

> Any person who shall wear, carry or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or *knowingly transport* any handgun, whether concealed or open, in any vehicle traveling upon the public roads . . . shall be guilty of a misdemeanor; and it shall be a rebuttable presumption that the person is knowingly transporting the handgun . . . .

*Lee*, 311 Md. at 647 (quoting Article 27, § 36B(b)). Article 27, § 36B(b) was enacted by the General Assembly in 1972 when it passed emergency legislation proposed by Governor Marvin Mandel to provide more stringent penalties against those who illegally carried handguns on the streets of Maryland. *See* Senate Bill 205, 1972 Leg., 375th Sess. (Md. 1972); House Bill 277, 1972 Leg., 375th Sess. (Md. 1972). The bill was signed into law by Governor Mandel as 1972 Md. Laws, ch. 13 "to make unlawful, generally regulate, and provide penalties for the wearing, carrying, or transporting of handguns[.]" Senate Bill 205, 1972 Leg., 375th Sess. (Md. 1972); *see also* Bill File to S.B. 205 (1972).[13]

---

[12] The Maryland Code was recodified in 2002 and Article 27, § 36B became § 4-203 of the Criminal Law Article. *See* 2002 Md. Laws, ch. 26. The Revisor's Note for CR § 4-203 states that "[t]his section is new language derived without substantive change from former Art. 27, § 36B(b) and (c)." *Id.*

[13] While the legislative history for bills enacted prior to 1976 is often scarce, in this case, an extensive bill file for the 1972 handgun legislation exists in the Department of Legislative Services' library. *Blue v. Prince George's Cty.*, 434 Md. 681, 694 n.18 (2013) ("It is typically difficult to locate legislative history in Maryland for bills enacted prior to 1976, when the Department of Legislative Reference began to systematically preserve bill files for each session. The Department did, however, compile a special bound volume of the bill files for the 1972 handgun legislation, which has been retained in the State Law Library.").

Prior to the General Assembly's enactment of Article 27, § 36B, its prohibition on illegal handguns fell within the more general provisions of Md. Code (1957, 1971 Repl. Vol.), Article 27, § 36(a). The prohibition on dangerous weapons, including handguns, in § 36(a) was originally enacted by the General Assembly in 1886 and provided:

> Every person not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, slung-shot [sic], billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) concealed upon or about his person, and every person who shall carry or wear any such weapon openly with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars or be imprisoned not more than six months in jail or the House of Correction.

1886 Md. Laws, ch. 375. That language remained substantively unchanged until 1972, albeit prescribing an enhanced $1,000 fine and maximum three-year term of imprisonment:

> Every person who shall wear or carry any pistol, dirk knife, bowie knife, switchblade knife, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon of any kind, whatsoever (penknives without switchblade excepted) concealed upon or about his person, and every person who shall wear or carry any such weapon openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not more than one thousand ($1,000.00) dollars or be imprisoned in jail, or sentenced to the Maryland Department of Correction for not more than three years[.]

Article 26, § 36(a) (1971 Repl. Vol.).

The General Assembly's creation of a provision that separately—and more stringently—punished wearing, carrying, or transporting handguns was, as is eminently clear from the multitude of amendments made to Senate Bill 205, part of a contentious legislative process. One such amendment, the inclusion of the word "knowingly" to the provision involving vehicular transportation, was the focus of the *Lee* Court's analysis in

15

determining whether wearing, carrying, or transporting a handgun was a strict liability offense.

The Court first looked to the plain language of Article 27, § 36B(b) and unequivocally held that the statute "create[d] strict liability for the wearing or carrying of a handgun about one's person." *Lee*, 311 Md. at 647. Although the Court's reasoning in *Lee* was grounded in the plain language of Article 27, § 36B(b), it also determined that the legislative history supported its interpretation that the General Assembly intended to create a strict liability offense:

> The scienter requirement applies only to vehicular transportation of a handgun and was inserted "so that a person who shows that he was not aware that his vehicle was transporting a handgun will not incur penalties." *Shell v. State,* 307 Md. 46, 69, 512 A.2d 358, 369 (1986). This interpretation is strengthened by the fact that the legislative bill by which § 36B(b) was proposed provided for strict liability without any knowledge requirement as to wearing, carrying and transporting. The "knowledge" requirement for transporting was inserted by amendment. *See* Acts of 1972, ch. 13. The addition of a scienter requirement specifically for vehicular transport underscores the corresponding omission of that requirement for wearing and carrying handguns.

*Id.*

The *Lee* Court went no further in reconciling the language of the statute with the legislature's purpose in enacting § 36B(b). Neither the bill file for Senate Bill 205 nor the language of the bill explicitly indicate the General Assembly's intent in amending the statute to include the word "knowingly" before the vehicular transportation provision in § 36B. In the end, however, the Court construed the omission of language indicating a *mens rea* requirement and the General Assembly's subsequent amendment adding the word

16

"knowingly" before "transport" as dispositive of the General Assembly's intent in affixing strict liability to "wearing and carrying handguns." *Id.*

We recognize that the direct lineage between CR § 4-203 and Article 27, § 36B(b), puts our decision today up against the doctrine of *stare decisis*. We address this issue below. However, because this is the first time that this Court has interpreted the more recently enacted CR § 4-203, we first offer our own statutory analysis.

*3.  Statutory Analysis.*

Our statutory analysis begins "with the plain language of the statute, and ordinary, popular understanding of the English language dictates [our] interpretation[.]" *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quoting *Schreyer v. Chaplain*, 416 Md. 94, 101 (2010)). "We read the 'statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Buckingham*, 472 Md. at 423 (quoting *Town of Forest Heights*, 463 Md. at 478). In contrast to Article 27, § 36B(b), CR § 4-203 provides two distinct modalities that are the focus of our statutory inquiry. Subparagraph (a)(1)(i), which was the only violation of CR § 4-203 charged by the State in this case, prohibits "wear[ing], carry[ing], or transport[ing] a handgun, whether concealed or open, on or about the person[.]"[14] CR § 4-203(a)(1)(i). As is evident from

---

[14] We are fully aware that the handgun found under Mr. Lawrence's car seat could have also been charged as a violation of CR § 4-203(a)(1)(ii), which specifically applies to handguns worn, carried, or transported in a vehicle and prescribes a general intent "knowingly" *mens rea*. Because of the proximity of the handgun to Mr. Lawrence's person, an argument can be made that the handgun was "on or about" his person because it was stored in a way that made it available for immediate use. However, our decision today in no way expands the scope of the term "on or about" in CR § 4-203(a)(1)(i).

17

the text, the General Assembly did not expressly include an element requiring that the State prove *mens rea*. Compare this with CR § 4-203's second modality, in which the General Assembly included "knowingly" as a required element of "wear[ing], carry[ing], or *knowingly* transport[ing], a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State[.]" CR § 4-203(a)(1)(ii) (emphasis added).

Mr. Lawrence asks that we read a "knowingly" *mens rea* into the statute's first modality even though it contains no language indicating a *mens rea* element. Mr. Lawrence's argument relies on the definitions of the terms used by the General Assembly in CR § 4-203(a)(1)(i), *i.e.* "wear, carry, or transport[.]" "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Buckingham*, 472 Md. at 423 (*Fangman v. Genuine Title, LLC*, 447 Md. 681, 691 (2016)). "Wear," according to Merriam Webster, means "to bear or have on the person[.]" *Wear*, Merriam Webster, https://www.merriam-webster.com/dictionary/wear [https://perma.cc/6697-Y6AR]. "Carry" means "to move while supporting: TRANSPORT[.]" *Carry*, Merriam Webster, https://www.merriam-webster.com/dictionary/carry [https://perma.cc/HA4X-JBYV]; *see In re Colby H.*, 362 Md. 702, 712 (2001) ("'Carry,' taken in its plain meaning, is defined as 'to move while supporting; convey; transport' or 'to wear, hold, or have around one.'"). "Transport" means "to transfer or convey from one place to another[.]" *Transport*, Merriam Webster, https://www.merriam-webster.com/dictionary/transport [https://perma.cc/EQ5R-GMH4].

18

In light of these definitions, Mr. Lawrence maintains that "wear," "carry," and "transport" are affirmative verbs whose definition implies some level of knowledge on the part of the doer. We agree to some extent that these verbs indicate some level of knowledge or understanding of the presence of the handgun, *i.e.* someone does not ordinarily "wear, carry, or transport" a handgun with no knowledge that they are doing so. Significantly, however, this argument improperly renders the word "knowledge" in subparagraph (a)(1)(ii) surplusage. "It is a common rule of statutory construction that, when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things." *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223 (2003) (citing *Parkinson v. State*, 14 Md. 184 (1859)). While this rule is not "immutable," we find it instructive in discerning whether the General Assembly intended to include "knowledge" as an element of subparagraph (a)(1)(i) without expressly stating so. *Id.* at 224. In choosing to exclude "knowingly" from subparagraph (a)(1)(i) but include it as an element of subparagraph (a)(1)(ii), we presume that the General Assembly "meant what it said and said what it meant." *Peterson v. State*, 467 Md. 713, 727 (2020) (quoting *Bellard v. State*, 452 Md. 467, 481 (2017)).

Such a construction of CR § 4-203(a)(1)(i) and (ii) conforms with this Court's "commonsensical" approach to statutory interpretation. *Della Ratta v. Dyas*, 414 Md. 556, 567 (2010) (quoting *Frost v. State*, 336 Md. 125, 137 (1994)). This Court's statutory interpretation "seek[s] to avoid constructions that are illogical, unreasonable, or inconsistent with common sense[;]" therefore, we must also reconcile the General Assembly's inclusion of a rebuttable presumption in CR § 4-203(a)(2). *Id.* Where

19

subparagraph (a)(1)(ii) requires that the State prove "knowledge" as an element of transporting a handgun in a vehicle, subsection (a)(2) creates a "rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly." *See* CR § 4-203(a)(2). The General Assembly's inclusion of a rebuttable presumption as to the vehicular transport modality, and not the modality for wearing, carrying, or transporting a handgun on or about the person, cuts against Mr. Lawrence's preferred interpretation.

Where both subparagraph (a)(1)(ii) and the rebuttable presumption in subsection (a)(2) prescribe "knowingly" as the requisite *mens rea* for transporting a handgun in a vehicle, we must also discern the definition of the term "knowingly." This Court has given different meanings to term "knowingly" in the *mens rea* context, which can either be read as requiring specific intent or general intent. *See, e.g.*, *Chow v. State*, 393 Md. 431 (2006). This Court, in *Shell v. State*, rejected an argument that the term "knowingly" in Article 27, § 36B(b) required specific intent, *i.e.*, that the State must prove that the defendant was transporting a handgun in a vehicle with the specific purpose of doing so. 307 Md. 46, 69– 70 (1986). Rather, the Court found that "knowingly" only required the State to prove general intent, reasoning that "the knowledge element of the offense was included largely to prevent unwitting violations, and the purpose of the criminal provision as a whole is to curb the transportation of handguns in vehicles . . . ." *Id.* Therefore, given this Court's analysis in *Shell*, we ascribe a general intent level of "knowledge" as the requisite *mens rea* in the vehicular transport modality, CR § 4-203(a)(1)(ii).

20

In light of this statutory analysis, we are under no illusion that the *Lee* Court misread the plain text of Article 27, § 36B(b) in that case. The statute was—as it is today—silent as to the *mens rea* of wearing, carrying, or transporting a handgun on or about the person. By citing to *Shell*, it appears that the *Lee* Court felt constrained by *Shell*'s pronouncement that "knowledge" only required the State to prove general intent for the vehicular transport modality. This ostensibly led the Court to believe that, because wearing, carrying, or transporting a handgun on or about the person did not include the word "knowingly," it required no knowledge of the facts that made up the offense and therefore imposed strict liability.

Our statutory interpretation of CR § 4-203(a)(1)(i) confirms the *Lee* Court's short analysis that affixed strict liability to wearing, carrying, or transporting a handgun on or about the person. We do recognize, however, that the *Lee* Court either declined to, or failed to, analyze the Supreme Court's longstanding presumption that criminal statutes should generally include a *mens rea* requirement. *See Rehaif*, 139 S. Ct. at 2195 (outlining the "longstanding presumption, traceable to the common law, that [the legislature] intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" (quoting *United States v. X-citement Video, Inc.*, 513 U.S. 64, 72 (1994))). This Court recognizes the Supreme Court's long-standing presumption in favor of including *mens rea*. *Chow*, 393 Md. at 463 ("The requirement that an accused have acted with a culpable mental state is an axiom of criminal jurisprudence." (citation omitted)). For the sake of completeness, and to check our understanding of the General Assembly's intent, we now delve into these principles.

21

### 4. The Presumption in Favor of Mens Rea.

Although we agree with Mr. Lawrence that the inclusion of *mens rea* in criminal statutes is generally presumed, the General Assembly has "wide latitude" to dictate the statutory elements of its criminal enactments. *Lambert v. California*, 355 U.S. 225, 228 (1957); *see Liparota v. United States*, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute."). As we stated above, our ultimate goal is to ascertain the intent of the General Assembly in enacting CR § 4-203(a)(1)(i). Here, the language and structure of CR § 4-203 provide strong textual indicators that the General Assembly intended to omit *mens rea* as an element. Moreover, in declining to amend the statutory language in the thirty-three years since *Lee* was decided, the General Assembly has acquiesced to the Court's holding in that case. Thus, we are unconvinced that the Supreme Court cases cited by Mr. Lawrence override the General Assembly's intent in eliminating *mens rea* as an element of wearing, carrying, or transporting a handgun on or about the person.

At common law, a criminal defendant had to have a "guilty mind" to be convicted of a crime. *Morissette v. United States*, 342 U.S. 246, 257 (1952). Before legislatures began codifying criminal statutes, a criminal offense at common law "occurred only upon the concurrence of the individual's act and his guilty state of mind." *Dawkins v. State*, 313 Md. 638, 643 (1988) (citing *Morissette*, 342 U.S. at 251–52).[15] Beginning with the

---

[15] This Court cited to *Morissette* as early as 1952, *see Wild v. State*, 201 Md. 73, 77 (1952), and later pointed to *Morissette*'s discussion of "the construction of criminal statutes" in

Supreme Court's seminal decision in *Morissette*, however, the Supreme Court has made clear that the omission of language indicating *mens rea* does not unquestionably eliminate *mens rea* as an element of a criminal statute. *See, e.g.*, *Elonis v. United States*, 575 U.S. 723, 734 (2015) ("The fact that [a] statute does not specify any required mental state . . . does not mean that none exists.").

In *Morissette*, the Supreme Court declined to construe the federal conversion statute, 18 U.S.C. § 641, as omitting *mens rea* as an element.[16] 342 U.S. at 273. Morissette was convicted of converting detonated bomb casings for scrap metal from a government-owned bombing range in Michigan. Throughout the proceedings against him, Morissette maintained that he thought the casings were abandoned and that he acted with no criminal intent. While the *Morissette* Court recognized the legislature's ability to regulate "public welfare offenses" by eliminating *mens rea*—and imposing strict liability—it determined that 18 U.S.C. § 641 was not a crime in which Congress intended to attach strict liability. *Id.* at 255, 276.

The Supreme Court's reasoning was grounded in the historical common law requirement that a criminal offense include *mens rea* as an element. *Id.* at 250–52. In reversing Morissette's conviction, the Supreme Court explained that "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or

---

declining to read an intent requirement into the criminal statute prohibiting bigamy. *See Braun v. State*, 230 Md. 82, 89–90 (1962).

[16] When Morissette was convicted of violating 18 U.S.C. § 641, it provided: "'[W]hoever embezzles, steals, purloins, or knowingly converts' government property is punishable by fine or imprisonment." *Morissette*, 342 U.S. at 248.

transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.* at 250. Morissette's conviction under 18 U.S.C. § 641 constituted a larceny-type offense at common law, therefore the Supreme Court declined to construe the statute as disposing of culpable intent, or *mens rea*, as an element of the offense.

Moreover, the Supreme Court determined that 18 U.S.C. § 641 did not fit the mold of a "public welfare offense," where the accused "usually is in a position to prevent [conviction] with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.* at 256. In reversing Morissette's conviction, the Supreme Court's holding had the practical effect of recognizing the divide between the original common law requirement that a criminal defendant have some level of culpable intent and the legislature's prerogative to strictly regulate conduct without prescribing an intent requirement.

The Supreme Court has repeatedly relied on its reasoning in *Morissette* as creating a framework of statutory analysis for interpreting the *mens rea* element in criminal statutes. As the Supreme Court explained in *Staples*, "[t]here can be no doubt" that the concepts outlined in *Morissette* have "influenced [its] interpretation of criminal statutes." *Staples*, 511 U.S. at 605; *see also United States v. United States Gypsum Co.*, 438 U.S. 422, 436 (1978) ("We start with the familiar proposition that '[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.'" (quoting *Dennis v. United States*, 341 U.S. 494, 500 (1951) (alteration in

24

original))). "Indeed, [the Supreme Court has] noted that the common-law rule requiring *mens rea* has been 'followed in regard to statutory crimes even where the statutory definition did not in terms include it.'" *Staples*, 511 U.S. at 605–06 (quoting *United States v. Balint*, 258 U.S. 250, 251–52 (1922)).

More recently, in *Elonis*, the Supreme Court expanded on its hesitancy to simply credit the plain language of a criminal statute that is silent as to *mens rea*. Relying on the analysis in *Morissette*, which we have described above, the *Elonis* Court succinctly summarized Justice Robert Jackson's reasoning as the foundation for its holding:

> We have repeatedly held that "mere omission from a criminal enactment of any mention of criminal intent" should not be read "as dispensing with it." This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." As Justice Jackson explained, this principle is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." The "central thought" is that a defendant must be "blameworthy in mind" before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like. Although there are exceptions, the "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." We therefore generally "interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them."

*Elonis*, 575 U.S. at 734 (alteration in original) (in text citations omitted).

Significantly, however, the Supreme Court made clear in *Morissette* that the legislature may enact strict liability offenses as it sees fit to regulate the public welfare. Just five years after *Morissette*, in *Lambert*, the Supreme Court declined to "go with Blackstone in saying that 'a vicious will' is necessary to constitute a crime . . . for conduct alone without regard to the intent of the doer is often sufficient." *Lambert*, 355 U.S. at 228

25

(quoting 4 Bl. Comm. *21).  The Supreme Court explained that "[t]here is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."  *Id.* (citation omitted).

Here, the General Assembly exercised its discretion in declining to include language indicating *mens rea* in CR § 4-203(a)(1)(i).  While Mr. Lawrence's argument in favor of a presumption of *mens rea* is well-founded, it fails to overcome the significant indicia of legislative intent to the contrary in this case.  Specifically, the General Assembly omitted *mens rea* as an element of CR § 4-203(a)(1)(i) while simultaneously including the word "knowingly" in CR § 4-203(a)(1)(ii).  While this does not *automatically* require us to omit *mens rea* as an element, the text and structure of CR § 4-203 make it clear that the General Assembly did not intend to include "knowledge" as an element of subparagraph (a)(1)(i).

The purpose behind the enactment of CR § 4-203 also supports such a conclusion.  This Court explained in *Kelley* that Article 27, § 36B included a declaration of the General Assembly's purpose in enacting the statutory scheme:

> (i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;
> (ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity;
> (iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and
> (iv) Further regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens.

26

*Kelley v. R.G. Indus., Inc.*, 304 Md. 124, 141–42 (1985) (quoting 1972 Md. Laws, ch. 13); *see* CR § 4-202 (outlining similar legislative findings for Title 4, Subtitle 2 of the Criminal Law Article).

"From the 1960s through the 1980s, violent gun crime was rampant in America. The wave of violence destroyed lives and devastated communities, particularly in America's cities." *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019) (Kavanaugh, J., dissenting). Maryland was not immune to this wave of violence involving illegal handguns. In fact, just as the General Assembly detailed in its policy declaration for Article 27 § 36B, "handgun use resulting in death and serious injuries had risen to troubling levels in [Maryland]" in the 1970s. *Blue*, 434 Md. at 693. Thus, the language enacted as Article 27, § 36B was submitted by Governor Marvin Mandel to the General Assembly as emergency legislation to "curb 'the widespread carrying of handguns on the streets and in vehicles by persons who have no legitimate reason to carry them.'" *Id.* at 693 n.16 (quoting Letter from Governor Marvin Mandel to Delegate Donald B. Robertson (December 21, 1971)); *see also* Senate Bill 205, 1972 Leg., 375th Sess. (Md. 1972); House Bill 277, 1972 Leg., 375th Sess. (Md. 1972).

The language used by the General Assembly in its policy declaration for Article 27, § 36B, and in its legislative findings in CR § 4-202, supports the State's assertion that the General Assembly intended to create a strict liability offense. Additionally, we are convinced that the General Assembly has acquiesced to this Court's holding in *Lee.* "The General Assembly is presumed to be aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that

27

interpretation." *Williams v. State*, 292 Md. 201, 210 (1981) (citing *Harden v. Mass Transit Admin.*, 277 Md. 399, 406 (1976)). In declining to amend the language of CR § 4-203(a)(1)(i) in the thirty-three years after *Lee* was decided, the General Assembly has acquiesced to the *Lee* Court's pronouncement that wearing, carrying, or transporting a handgun on or about the person is a strict liability offense.

As the State points out, the statutory language of CR § 4-203(a)(1)(i) has remained substantially unchanged despite numerous reenactments over the years. In 2002, Article 27 was repealed, and its language was recodified in the Criminal Law Article without substantive change as part of Maryland's code revision.[17] *See* 2002 Md. Laws, ch. 26. Since the recodification of Article 27, the General Assembly has amended CR § 4-203 eight subsequent times without changing the language of subparagraph (a)(1)(i).[18] "This Court provides judicial deference to the policy decisions enacted into law by the General

---

[17] As we noted in *Johnson v. State*, "code revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable to those who must abide by it." 467 Md. 362, 381 n.8 (2020) (quoting *In re S.K.*, 466 Md. 31, 56 n.21 (2019)). We further explained that:

> Maryland Code Revision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code. This formal revision of the statutory law for the General Assembly was coordinated by the Department of Legislative Services. Code Revision was completed in 2016 with the enactment by the General Assembly of the Alcoholic Beverages Article.

*Id.*

[18] *See* 2003 Md. Laws, ch. 17; 2003 Md. Laws, ch. 21; 2004 Md. Laws, ch. 25; 2005 Md. Laws, ch. 482; 2010 Md. Laws, ch. 712; 2011 Md. Laws, ch. 65; 2013 Md. Laws, ch. 427; 2018 Md. Laws, ch. 146.

28

Assembly." *Blackstone*, 461 Md. at 113 (quoting *Phillips v. State*, 451 Md. 180, 196 (2017)). If the General Assembly intended for subparagraph (a)(1)(i) to set forth a "knowingly" *mens rea*, it had ample opportunity post-*Lee* to amend the statute to include language indicating such. Thus, even in light of the Supreme Court's well-founded presumption that a criminal offense ought to include *mens rea* as an element, the text, purpose, and history of § 4-203(a)(1)(i) all suggest that the General Assembly intended for it to impose strict liability.

5. *Stare Decisis.*

The *Lee* Court's statutory interpretation, which affixed strict liability to the prohibition on wearing, carrying, or transporting a handgun on or about the person, requires us to consider the doctrine of *stare decisis*. "The crux of the doctrine of *stare decisis* is that courts should reaffirm, follow, and apply ordinarily the published decisional holdings of our appellate courts even though, if afforded a blank slate, the court might decide the matter differently." *State v. Stachowski*, 440 Md. 504, 520 (2014) (citing *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 689 (2013)).

Although the doctrine is not absolute, we employ *stare decisis* to "encourage[] the consistent development of legal principles, public reliance on our judicial decisions, and the perceived integrity of the courts." *Id.* (citing *Livesay v. Baltimore Cty.*, 384 Md. 1, 14 (2004)). We have recognized two "extremely narrow" situations where it "would be appropriate to overrule our own precedent." *Wallace v. State*, 452 Md. 558, 582 (2017) (quoting *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 63–64 (2010)). The first exception allows the Court to "strike down a decision that is[] 'clearly wrong and contrary to

29

established principles.'" *Id.* (quoting *DRD Pool Serv., Inc.*, 416 Md. at 64). The second allows the Court to overrule its own precedent "when there is a showing that the precedent has been superseded by significant changes in the law or facts." *Id.* In essence, we "need not adhere to *stare decisis* where changed conditions or increased knowledge have rendered [our] precedent unsound in the circumstances of modern life, a vestige of the past, [and] no longer suitable to [the] people[.]" *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 58 (2015) (first alteration added) (citation and internal quotation marks omitted).

Neither exception to the doctrine of *stare decisis* applies here. Although short, the *Lee* Court's analysis was not "clearly wrong and contrary to established principles." *Wallace*, 452 Md. at 582 (quoting *DRD Pool Serv., Inc.*, 416 Md. at 64). The plain language approach taken by the Court in *Lee*, in conjunction with its reliance on the General Assembly's amendment adding the word "knowledge" to the vehicular transport modality, accords with this Court's fundamental rules of statutory construction. Our statutory analysis of CR § 4-203 confirms the *Lee* Court's statutory interpretation of Article 27, § 36B(b). Unlike the *Lee* Court's analysis, we checked our statutory interpretation of CR § 4-203 against the Supreme Court's longstanding and well-founded rules of statutory construction for ascertaining the legislature's intent as to the *mens rea* element. Still, we determined that the General Assembly made clear its intent that CR § 4-203(a)(1)(i) impose strict liability.

We also disagree with Mr. Lawrence that this Court's decision in *Lee* is in conflict with our decisions in *Dawkins v. State* and *State v. McCallum*. 313 Md. at 638; 321 Md. 451 (1991). In *Dawkins v. State*, this Court set forth several considerations for determining

30

whether the General Assembly intended for a statute to set forth a strict liability "public welfare offense." *See* 313 Md. at 643. The Court subsequently adopted the *Dawkins* factors in *McCallum*, 321 Md. at 456. Notably, however, the statutes at issue in those cases are distinguishable from CR § 4-203 because they were *entirely* silent as to *mens rea*. Furthermore, given the strong indicia of legislative intent here, we need not apply the *Dawkins* factors to determine whether the General Assembly intended to classify CR § 4-203 as a regulatory "public welfare offense."

In *Dawkins*, this Court addressed whether "knowledge" was "an element of the offenses of possession of a controlled dangerous substance and possession of controlled paraphernalia under Maryland Code (1957, 1987 Repl. Vol.), Art. 27, § 287(a) and (d)." 313 Md. at 639–40. The defendant in that case, Leonard Dawkins, was arrested in a Baltimore City hotel room after police officers searched a tote bag that he was holding and found both heroin paraphernalia and heroin residue inside. *Id.* at 640. Mr. Dawkins testified at trial that the tote bag belonged to his girlfriend and that he had no knowledge of its contents. *Id.*

At the close of evidence, the Circuit Court for Baltimore City instructed the jury on the elements of Article 27, § 287(a) and (d), and declined to include "knowledge" as an element of either crime. *Id.* at 641. The Court of Special Appeals affirmed, holding that neither Article 27, § 287(a) nor (d) prescribed a *mens rea* requirement. *Id.* This Court reversed and, in citing to *Morissette*, recognized that at common law, "a crime occurred only upon the concurrence of the individual's act and his guilty state of mind." *Id.* at 643 (citing *Morissette*, 342 U.S. at 251–52). The Court also recognized the history of strict

31

liability offenses in the public welfare context and their common characteristics; how they are: (1) "generally regulatory in nature," (2) generally involve light penalties, and (3) generally put the defendant "in a position to prevent the violation from occurring." *Id.* at 644–65 (citation omitted). Where the text and statutory structure of Article 27, § 287(a) and (d) suggested that the General Assembly intended for "possession" to require a "knowingly" *mens rea*, and neither crime was a "public welfare offense," the Court held that the General Assembly did not intend for its omission as to the *mens rea* element to dispose of that element altogether.

Although the General Assembly omitted *mens rea* as an element of the statute in *Dawkins*, that statute was derived from the model language of the Uniform Controlled Substances Act ("UCSA"). *Id.* Unlike the text of the Maryland statute, the model language of the USCA only prohibited "knowing and intentional possession." *Id.* at 646. Given this extrinsic indication that the General Assembly may have intended to include *mens rea* as an element, the Court turned to several out-of-state cases to resolve whether the General Assembly intended for its omission of language indicating *mens rea* to create a strict liability offense. *See id.* at 647–48.

In surveying those cases, this Court pointed out that a majority of states construed the word "possession" as requiring a "knowingly" *mens rea*. *See id.* Thus, the General Assembly's use of the word "possession" in Article 27, § 287(a) and (d), especially in light of its statutory definition in Article 27, § 277,[19] inferred that "knowledge" was an element

---

[19] Article 27, § 277 defined "possession" as "the exercise of actual or constructive *dominion or control* over a thing by one or more persons." (Emphasis added).

of possession of drug paraphernalia and possession of a controlled dangerous substance. *Id.* at 648–51 ("[A]n individual ordinarily would not be deemed to exercise 'dominion or control' over an object about which he is unaware[.]"); *accord Parker v. State*, 402 Md. 372, 407 (2007) ("A possession conviction normally requires knowledge of the illicit item.").

We have found no such indicia demonstrating that the General Assembly intended to include *mens rea* as an element of CR § 4-203(a)(1)(i). In contrast to the relationship between CR § 4-203(a)(1)(i) and (ii), the statutory structure in *Dawkins* supported the assertion that the General Assembly intended to include *mens rea* as an element of Article 27, § 287(a) and (d). The statute at issue in *McCallum* is similarly distinguishable on the ground that it was entirely silent as to *mens rea* and provided no indication that the General Assembly intended to omit *mens rea* as an element.

In that case, the Court was tasked with determining whether "knowledge" was an element of Md. Code (1984, 1987 Repl. Vol.), Transp. ("TR") § 16-303(c).[20] *McCallum*, 321 Md. at 452. In the absence of any concrete indication as to the General Assembly's intent, the Court applied the three *Dawkins* factors to determine whether, in omitting language indicating *mens rea*, the General Assembly intended for TR § 16-303(c) to

---

[20] TR § 16-303 provided: "A person may not drive a motor vehicle on any highway . . . while the person's license or privilege to drive is suspended in this state."

impose strict liability as a "public welfare offense." This Court held that it did not and ascribed a "knowingly" *mens rea* to the driving while suspended statute.

However, nothing in *McCallum* speaks directly to the statute at issue here, nor does it constitute "a showing that [*Lee*] has been superseded by significant changes in the law or facts." *Wallace*, 452 Md. at 582 (quoting *DRD Pool Serv., Inc.*, 416 Md. at 64). Because the General Assembly's intent in enacting CR § 4-203(a)(1)(i) (and by extension, Article 27, § 36B(b)) is clear by its plain language and legislative history, the approach taken in *Dawkins* and followed in *McCallum* does not supersede the *Lee* Court's holding or call its analysis in into question. *See Owens v. State*, 352 Md. 663, 672 (1999) ("The Supreme Court . . . has never suggested that strict criminal liability may be imposed only for regulatory offenses.").

Lastly, Mr. Lawrence challenges the *Lee* Court's holding on constitutional grounds. While the scope of CR § 4-203(a)(1)(i) gives the Court some pause, we do not go as far as finding the statute unconstitutional under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. As this Court explained in *Owens v. State*, "constitutional due process does not impose a universal requirement that criminal laws . . . include a *mens rea* element[.]" 352 Md. at 679. We further explained that, "[i]n contrast to its policy of favoring inclusion of a *mens rea* element when interpreting a statute, when interpreting the Due Process Clause[,] the Supreme Court has often endorsed the concept of strict criminal liability." *Id.* at 677. This much was made clear in both the Supreme Court's *Morissette* and *Lambert* decisions, *supra*.

34

Mr. Lawrence cites to *Lambert* in attempting to analogize CR § 4-203(a)(1)(i) with an unconstitutional Los Angeles felon-registration statute. However, such a comparison is inapposite. In *Lambert*, the Supreme Court considered the constitutionality of a Los Angeles ordinance that criminalized visiting the city as a convicted felon without registering with the authorities. 355 U.S. at 225. The issue in that case was "whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of [that person's] duty to register, and where no showing is made of the probability of such knowledge." *Id.* at 227.

The Supreme Court explained that "[e]ngrained in our concept of due process is the requirement of notice[,]" and that the notice requirement inherent in the Due Process Clause "is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case." *Id.* at 228. Because the ordinance punished entirely passive conduct, the Court struck down the ordinance as unconstitutional. The Court reasoned, in quoting the academic work of Supreme Court Justice Oliver Wendell Holmes,[21] that "[a] law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear." *Id.* at 229 (quoting Oliver Wendell Holmes, Jr., *The Common Law* (1881)). Because entirely passive conduct could subject a defendant to

_____

[21] Oliver Wendell Holmes, Jr. served as an Associate Justice of the Supreme Court of the United States from 1902 to 1932. Justice Holmes published *The Common Law* while working in private practice in Boston in 1881. Shortly thereafter, in 1882, Justice Holmes accepted an endowed professorship at Harvard Law School and was appointed Associate Justice of the Massachusetts Supreme Judicial Court. Justice Holmes would go on to become Chief Justice of the Massachusetts Supreme Judicial Court in 1899.

conviction under the *Lambert* ordinance without any knowledge of their duty to register with the city, the Court held that the ordinance was inconsistent with the requirements of the Due Process Clause.

We disagree that CR § 4-203(a)(1)(i)'s prohibition on wearing, carrying, or transporting a handgun on or about the person punishes entirely passive conduct, such that it offends the requirements of the Due Process Clause. This Court has interpreted the term "on or about the person" as including handguns that are in close proximity to the defendant. *See Corbin v. State*, 237 Md. 486, 491 (1965) ("In order to support the conviction of the carrying or wearing a dangerous or deadly weapon, it was necessary that the State establish the fact that the accused was carrying the weapon or that it was in such proximity to him as would make it available for his immediate use."); *see Lee*, 311 Md. at 647 n.1 (citing *Corbin* for the same proposition). More recently, in *Jefferson v. State*, the Court of Special Appeals determined that a handgun under the passenger seat of a car was "about" the defendant's person because "the loaded gun was in close proximity to [the defendant's] person and was available for immediate use." 194 Md. App. 190, 216 (2010). We disagree with Mr. Lawrence's argument that having a handgun so close to one's person that it is available for immediate use constitutes entirely innocent, passive conduct. It is for this reason that we decline to strike down CR § 4-203(a)(1)(i) as violative of the Due Process Clause.

However, we do think that this Court's, and the Court of Special Appeals', broad application of the term "on or about" leaves some questions about the notice afforded to defendants alleged of wearing, carrying, or transporting a handgun "about" their person.

36

While we do not see fit to invalidate CR § 4-203(a)(1)(i) on constitutional grounds, the correct course of action in instances such as these is to signal to the General Assembly that, "in light of these policy concerns, . . . legislation ought to be considered" to address the scope CR § 4-203(a)(1)(i) given its classification as a strict liability offense. *In re S.K.*, 466 Md. at 57–58.

Nonetheless, we hold that CR § 4-203(a)(1)(i) sets forth a strict liability offense. Thirty-three years ago, in interpreting the predecessor statute to CR § 4-203(a)(1)(i), this Court's *Lee* decision affixed strict liability to the crime of wearing, carrying, or transporting a handgun on or about the person. Our interpretation of the text, statutory structure, and legislative history of CR § 4-203(a)(1)(i) confirms such an interpretation, even in light of the Supreme Court's presumption in favor of including *mens rea* as an element of criminal statutes. Moreover, in declining to amend the language of the offense in the thirty-three years since *Lee* was decided, it is apparent that the General Assembly has acquiesced to our holding in that case. The General Assembly has "wide latitude" to set forth strict liability offenses as long as they are constitutional. Where CR § 4-203(a)(1)(i) neither violates the Due Process Clause of the United States Constitution nor requires us to consider whether the General Assembly intended to set forth a "public welfare offense," we see no need to depart from the doctrine of *stare decisis*.

## CONCLUSION

For the foregoing reasons, we hold that CR § 4-203(a)(1)(i) sets forth a strict liability offense that does not require the State to prove *mens rea* as an element. Thus, we affirm the judgment of the Court of Special Appeals below and hold that the Circuit Court for

37

Harford County did not abuse its discretion in propounding the State's requested pattern

jury instruction.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**